NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0544
The State
v.
Ovalle

On Appeal from the Superior Court of Bartow County
No. SUCR2021002835

Decided: June 30, 2026

COLVIN, Justice.

After a jury found Erik Ovalle guilty of the felony murder of Gabriel Martin Nicholson (Count 1) predicated on the felony distribution of fentanyl (Count 2), the trial court entered an order granting Ovalle a new trial on Count 1.[1] The trial court concluded

---

[1] The drug distribution charged in this case occurred in June 2021. On December 13, 2021, a Bartow County grand jury returned an indictment charging Ovalle with felony murder predicated on the distribution of a controlled substance, namely, fentanyl (Count 1), and a violation of the Georgia Controlled Substances Act for unlawfully distributing fentanyl (Count 2). A jury trial was held from February 13 through 17, 2023, and the jury found Ovalle guilty of both counts. The trial court sentenced Ovalle to life in prison followed by life on probation for felony murder (Count 1) and merged for sentencing purposes the violation of the Georgia Controlled Substances Act (Count 2). Ovalle timely filed a motion for new trial through new counsel on March 27, 2023, and filed an amended motion for new trial on August 1, 2025. Following a motion-for-new-trial hearing, the trial court entered an order granting Ovalle's motion for new trial on September 4, 2025, and entered an amended order clarifying that the court was granting Ovalle's motion for new trial only as to Count 1 on September 15, 2025. The State filed a timely notice of appeal

that the trial evidence did not support the jury's verdict on Count 1 because the evidence showed that Nicholson's fatal injury (the ingestion of fentanyl) did not occur "in the commission of" the predicate felony (Ovalle's felony drug distribution) but instead occurred after the felony drug distribution was completed. See OCGA § 16-5-1(c) (providing that "[a] person commits the offense of [felony] murder when, *in the commission of a felony*, he or she causes the death of another human being irrespective of malice." (emphasis added)). And because the trial court had granted a new trial based on its analysis of the "in the commission of" element of felony murder, the trial court expressly declined to address the other arguments Ovalle raised in his motion for new trial, including the argument that the trial evidence failed to show that his conduct proximately caused Nicholson's death.

The State appeals from the trial court's order granting Ovalle a new trial on Count 1. As explained below, we conclude that the trial court failed to apply the correct legal standard in analyzing whether the trial evidence supported a finding that Ovalle caused Nicholson's death "in the commission of" the predicate felony (the distribution of fentanyl). Accordingly, we vacate the trial court's judgment and remand for further proceedings consistent with this opinion.

1. The trial evidence showed the following. Nicholson, who was 16 years old when he died in June 2021, had a history of drug use. Sometime during the month preceding his death, Nicholson rode with his coworkers to Ovalle's apartment. After arriving, Nicholson exited his coworker's vehicle, met with Ovalle, and returned with a clear baggie containing white powder. According to

from the trial court's amended order granting the motion for new trial. The case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

2

Ovalle, whose audio-recorded police interview was introduced into evidence and played for the jury, Ovalle had given Nicholson some "boyd," a slang term referring to heroin.

On June 19, Nicholson sent Ovalle a text message stating that the "boyd" he got from Ovalle had made him sick, which was "a problem." Nicholson and Ovalle exchanged additional text messages over the following days, resulting in Nicholson sending a text message that indicated the problem had been resolved and that they were now "good."

On June 24, Nicholson rode with his coworkers to the restaurant where they worked. Just before his 2:00 p.m. shift started, Nicholson sent Ovalle a text message asking about a "reup." Ovalle admitted in his police interview that he drove to the restaurant where Nicholson worked to sell him "a gram," and that he ran out of gas in the restaurant's parking lot.

At 4:17 p.m., Ovalle sent a text message to Nicholson, saying that he was "[h]ere but got to weigh." And during his 30-minute break, Nicholson went out to meet Ovalle at his vehicle.

Surveillance footage from the restaurant, which was introduced into evidence and played for the jury, showed that Nicholson approached Ovalle's vehicle on foot, retrieved a gas can from the back seat, walked in the direction of a gas station adjacent to the restaurant, returned to Ovalle's vehicle with the gas can, and started filling up the tank. After spending some time filling up the tank, Nicholson approached the driver's side window and appeared to reach toward the window before putting something into his back pocket. Nicholson then walked back to the gas can and continued filling the tank. Shortly thereafter a delivery truck pulled into the parking lot, partially obscuring the camera's view of Ovalle's vehicle. Less than a minute later, Ovalle's vehicle exited the restaurant's parking lot and drove away. A few seconds

3

after Ovalle's departure, Nicholson stood near his coworker's truck. Nicholson then disappeared from view of the camera in the direction of his coworker's truck. About 14 minutes later, Nicholson exited his coworker's truck and walked back toward the restaurant, while appearing to wipe his nose on his shoulder and then with his hand.

Although Nicholson was behaving normally before his break, his coworkers observed that, after returning from break, he was sweating profusely, his eyes were rolling back into his head, he was slurring his speech, and he was having trouble standing. A restaurant employee called Nicholson's mother. Around 7:30 p.m., Nicholson's stepfather drove to the restaurant, picked up Nicholson, and brought him home.

After helping Nicholson get into the house, Nicholson's stepfather gave Nicholson some Benadryl to address a rash Nicholson was complaining about. He then allowed Nicholson to go to bed, believing that Nicholson had been drinking and needed to "sleep it off." On the morning of June 25, Nicholson's stepfather went to Nicholson's bedroom to check on him and found him lying dead in his bed.

A forensic toxicologist determined that Nicholson's blood contained 16 micrograms per liter of fentanyl, as well as other drugs, but did not contain any heroin or heroin metabolites. And the medical examiner determined that fentanyl was Nicholson's sole cause of death.

Two days after Nicholson was found dead, Ovalle, who did not know that Nicholson had died, sent a string of text messages to the phone Nicholson had previously used to contact him. In those messages, Ovalle attempted to inform Nicholson that he "[g]ot some news," that "[g]ood brown" (a slang term for heroin) "is in," that "[e]verybody is loving it," and that Ovalle "[w]anted

4

to let [Nicholson] know in case [Nicholson] wanted [some]." Several days later, Ovalle was pulled over and arrested. A narcotics detection dog alerted to the presence of drugs in Ovalle's vehicle. And a subsequent search of the vehicle revealed small plastic bags containing powder that appeared to be heroin but was later determined to be fentanyl.

2. On appeal, the State challenges the trial court's grant of a new trial to Ovalle on Count 1, which charged him with felony murder predicated on the distribution of fentanyl. As noted above, the trial court granted Ovalle a new trial on Count 1 based on a determination that the trial evidence was insufficient to prove the "in the commission of" element of felony murder.

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1(c). "From this statutory language, our decisional law has identified certain related prerequisites the State must establish to convict a defendant of felony murder." *Eubanks v. State*, 317 Ga. 563, 568 (2023). First, the predicate felony that the defendant committed must be "inherently dangerous to human life," meaning that it is "one from which it was reasonably foreseeable that death could result." Id. at 568 (quotation marks omitted). Second, the defendant's criminal conduct must proximately cause the victim's death. See id. at 568–69. The proximate cause "showing has two components: cause in fact and legal cause." *Melancon v. State*, 319 Ga. 741, 751 (2024). As we have explained,

> [a] defendant's conduct is a cause in fact of a death
> if the defendant's conduct played a substantial part
> in bringing about or actually causing the death —
> typically shown through evidence that the death
> would not have happened "but for" the defendant's

5

conduct — or if the defendant's conduct materially accelerated the death. And a defendant's conduct is a legal cause of a death if the death was reasonably foreseeable — that is, a probable or natural consequence of the criminal conduct according to ordinary and usual experience, not a merely possible result. Determining whether the State has proved these requirements in any given case is fact-intensive and demands mixed considerations of logic, common sense, justice, policy, and precedent, so questions of causation are generally left to the jury at trial.

Id. at 751–52 (cleaned up). Finally, "the death must have been caused 'in the commission of' the predicate felony." *Eubanks*, 317 Ga. at 568. The "in the commission of" requirement "is closely related to proximate cause in that it concerns the connection between the felony and the death." Id. at 571. And it likewise focuses on the defendant's conduct, asking whether the conduct of the defendant that was the proximate cause of the victim's death occurred "concurrent with" the defendant's commission of the predicate felony.[2] Id. at 572 (quotation marks omitted). See, e.g., *Franklin v. State*, 295 Ga. 204, 208–09 (2014) (holding that the trial evidence supported the defendant's conviction for felony murder predicated on aggravated assault because "[t]he evidence show[ed] that the head trauma [inflicted by the defendant], complications from which led to the victim's death, was received during [the defendant's] aggravated assault of the victim").

---

[2] The "in the commission of" requirement concerns when the proximate cause of the victim's death occurred and does not require that the death itself occur during the commission of the felony. See *Hood*, 303 Ga. at 422 ("[T]he victim's death need not occur at the moment the predicate felony is committed[.]").

6

Here, the trial court ruled that the trial evidence was insufficient to establish the "in the commission of" requirement of felony murder. But in doing so, the trial court focused on the *victim's* conduct, rather than the *defendant's* conduct, as the relevant cause of the victim's death. Specifically, the trial court determined that the trial evidence did not support a finding that the "in the commission of" requirement was satisfied because the evidence showed that Nicholson could not have ingested the fentanyl that caused his death until after Ovalle's distribution offense was completed.[3]

Considered in isolation, the trial court's ruling on the "in the commission of" requirement — which considered only what the court described as Nicholson's "independent act" of ingesting the fentanyl as a possible cause of his death — would suggest that the trial court implicitly ruled that Nicholson's conduct was the sole proximate cause of his death (an intervening act that broke any possible chain of proximate causation leading back to Ovalle's conduct). But it is clear from the trial court's order as a whole that the court did not intend to make an implicit ruling on the proximate cause element because it expressly declined to rule on Ovalle's argument that the trial evidence did not support a finding that his criminal conduct was a proximate cause of Nicholson's death.

Because the parties have not briefed the issue of whether the trial evidence was constitutionally sufficient to show that

---

[3] Although we conclude that the trial court ultimately failed to apply the appropriate legal standard when analyzing the "in the commission of" requirement, we acknowledge the trial court's thoughtful consideration of our precedent and its diligent effort to apply that precedent in a novel factual context.

Ovalle's conduct related to the distribution of fentanyl was a proximate cause of Nicholson's death, it would be premature for us to resolve that issue or for us to resolve the related issue of whether the trial evidence was constitutionally sufficient to establish the "in the commission of" requirement. Accordingly, we vacate the trial court's order granting Ovalle a new trial on Count 1 and remand the case to the trial court for further consideration of Ovalle's motion for new trial consistent with this opinion.[4]

*Judgment vacated and case remanded. All the Justices concur, except LaGrua, J., who dissents.*

---

[4] We note that Ovalle's motion for new trial included at least one other claim for relief (a claim challenging the jury instructions) in addition to his claims that the trial evidence was constitutionally insufficient to satisfy the "in the commission of" and proximate cause elements of felony murder. Nothing in this opinion limits the issues the trial court may consider on remand or requires that the trial court address those issues in a particular order.

LAND, Justice, concurring.

Because the trial court has not yet ruled on the specific issue of whether Ovalle's distribution of fentanyl to 16-year-old Gabriel Nicholson proximately caused his death, I concur with the majority opinion's decision to vacate the trial court's grant of Ovalle's motion for new trial and remand this case to the trial court for a ruling on this issue in the first instance. While it is tempting to decide the issue ourselves without a remand, doing so would be inconsistent with our role as a court of review, not a court of first view. See *Wasserman v. Franklin County*, 320 Ga. 624, 653 (2025). However, our judicial restraint with respect to this question does not mean we should avoid giving the trial court sufficient guidance on exactly what it is to do on remand. Because I believe that additional guidance beyond what is provided by the majority opinion would not only be helpful to the trial court tasked with deciding this issue in the first instance but would also promote judicial economy by shining much needed light on the legal issue to be decided on remand, I write separately to provide my view of how the law in this area applies to the facts of this case. For the reasons discussed below, it is my opinion that this issue is not particularly close. Under the controlling law, and for many of the reasons discussed in the cases cited by the dissenting opinion, it is difficult to envision how the trial court could overturn the jury's verdict based on the alleged insufficiency of the evidence of proximate cause.

As noted by both the majority opinion and the dissenting opinion, the evidence in this case shows that Ovalle provided fentanyl to a 16-year-old boy who, by all accounts, suffered from a serious drug problem. Ovalle knew about Nicholson's drug problem and vulnerability and preyed upon him by feeding his habit on multiple occasions. On the date in question, this teenager

9

thought he was buying heroin from Ovalle, but he received a fatal dose of fentanyl instead. Within minutes of Ovalle's distribution of the fentanyl, Nicholson did what was reasonably foreseeable — he ingested the fentanyl, almost immediately became sick, and died from fentanyl toxicity less than a day later.

This was not the first time Nicholson had become sick and gone to the hospital after taking drugs provided to him by Ovalle. Ovalle was aware that Nicholson had gone to the hospital days before his death after he ingested drugs that Ovalle provided to him. Under these circumstances, it is hard to imagine a scenario where the trial court could properly overturn the jury's verdict based on a determination that Ovalle's distribution of fentanyl did not proximately cause Nicholson's death. Let me explain why.

First, "[a]s a determination that requires mixed considerations of logic, common sense, justice, policy, and precedent, whether proximate cause is satisfied is undeniably a jury question and is always to be determined on the facts of each case." *Eubanks v. State*, 317 Ga. 563, 576 (2023) (cleaned up). Where, as here, there is evidence from which a jury could rationally decide that proximate cause exists, we should refrain from substituting our judgment for that of the jury.

Second, as the majority opinion correctly holds, the issue of proximate cause is focused on the foreseeability of the victim's death as a result of the defendant's criminal conduct. Under the facts of this case, Ovalle cannot credibly argue that Nicholson's ingestion of the fentanyl was not reasonably foreseeable. Nicholson had previously taken drugs provided to him by Ovalle, and that was the whole purpose of the transaction that led to Nicholson's death. Further, given the evidence presented at trial concerning the deadly nature of fentanyl, it also seems clear that one of the foreseeable risks of taking this drug was the risk that

played out here, death.

Third, any argument that Nicholson's ingestion of the fentanyl, as opposed to Ovalle's distribution of it, was the sole proximate cause of Nicholson's death is contrary to our precedent. An intervening act that takes place after the defendant's criminal conduct and before the victim's death does not cut off proximate cause if that intervening act could "reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer." *Calhoun v. State*, 308 Ga. 146, 149 (2020) (citation omitted). In other words, so long as the intervening act is reasonably foreseeable, that intervening act does not prevent a finding that a drug dealer's conduct was the proximate cause of the victim's death. See *Eubanks*, 317 Ga. at 569–70. Viewed in this light, it is difficult to accept the argument that this teenage victim's ingestion of the fentanyl provided to him by Ovalle was the sole proximate cause of his death.

Here, it is undisputed that Nicholson died because he ingested the fentanyl provided to him by Ovalle. Thus, the question for the trial court on remand with respect to the issue of proximate cause is simple and straightforward: Was it reasonably foreseeable that Ovalle's distribution of fentanyl to Nicholson would result in his ingestion of the drug and subsequent death? While I am content to let the trial judge decide this question in the first instance for the reason stated above, it is difficult for me to imagine how the trial court can conclude that Nicholson's ingestion of the drug and resulting death were not reasonably foreseeable.

As further guidance for the trial court, I would also point out that we have previously upheld felony murder convictions against drug dealers in analogous cases where drug users have overdosed on the drugs provided to them by their dealers. See, e.g., *Chua v. State*, 289 Ga. 220, 229–30 (2011); *Hulme v. State*,

11

273 Ga. 676, 678–80 (2001), overruled in part on other grounds by *State v. Jackson*, 287 Ga. 646 (2010). I see no meaningful distinction between these decisions and the facts of this case.

Finally, I also observe that we are remanding this case to the trial court for a decision not only on proximate cause but also on the "closely related" issue of felony murder's "in the commission of" requirement. Since we are vacating the trial court's ruling on the "in the commission of" issue, I think it would also be helpful if we gave the trial court some additional guidance on how to resolve that issue. As correctly stated by the majority opinion, the "in the commission of" requirement "focuses on the defendant's conduct, asking whether the conduct of the defendant that was the proximate cause of the victim's death occurred 'concurrent with' the defendant's commission of the predicate felony." Maj. Op. at 9. This requirement is focused on "when the proximate cause of the victim's death occurred and does not require that the death itself occur during the commission of the felony." Maj. Op. at 9 n.2. Thus, it logically follows that if the trial court determines that Ovalle's distribution of fentanyl to Nicholson was the proximate cause of his death (a finding that I believe is virtually inescapable), then the "in the commission of" requirement would be satisfied as well. In that instance, it would be clear that the conduct constituting the proximate cause of Nicholson's death (Ovalle's distribution of fentanyl) indisputably occurred during the commission of the predicate felony. Under these circumstances, where the proximate cause of Nicholson's death and the predicate felony are one and the same, there is simply no "in the commission of" problem.

In sum, I fully concur in the majority opinion's decision to vacate and remand, but I believe that additional guidance beyond what is provided by the majority opinion would be helpful and

much appreciated by the trial court. For that reason and in that spirit, I offer the above thoughts for the trial court's consideration as it decides these issues on remand.

I am authorized to state that Justice Ellington and Justice McMillian join in this concurrence.

LaGrua, Justice, dissenting.

While I agree with the majority opinion that the "in the commission of" element of the felony murder statute "concerns when the proximate cause of the victim's death occurred and does not require that the death itself occur during the commission of the felony," Maj. Op. at 6, n.2 (citing *Hood v. State*, 303 Ga. 420, 422 (2018)), I respectfully dissent in this case because I believe, based on our precedent, that the evidence was constitutionally sufficient to support Ovalle's conviction for felony murder, see *Jackson v. Virginia*, 443 US 307, 319 (1979), and thus, I would reverse the trial court's order granting him a new trial.[5]

When we review a trial court's order granting a defendant a new trial on the basis that the trial evidence was constitutionally insufficient to support the defendant's conviction, we apply the standard established by *Jackson*, 443 US at 319, which requires us to "review the evidence in the light most favorable to the verdict," leaving "to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Sinkfield v. State*, 318 Ga. 531, 537 (2024) (cleaned up; emphasis supplied).

This is what the jury saw and heard in reaching their guilty verdicts in this case: The victim, Gabriel Nicholson, was a 16-year-old with a serious drug problem. At the time of his death, Nicholson had gotten drugs from 41-year-old Ovalle at least three times—on one occasion Nicholson purchased the drugs, and on the other two occasions, Ovalle gave the drugs to Nicholson for

---

[5] Although the trial court purported to grant Ovalle a new trial, its conclusion that the evidence was insufficient as to the in-the-commission element of felony murder, if correct, would preclude retrial on the felony murder count. See *Bostic v. State*, 322 Ga. 688, 688 n.1 (2025).

free. And Nicholson considered Ovalle to be his "source to obtain drugs" and his "plug"—"another known name [for] a drug dealer."

More specifically, the evidence demonstrated that, about a month prior to Nicholson's death, he rode with two of his co-workers to an apartment complex—the same apartment complex where Ovalle lived—because Nicholson wanted to purchase marijuana. According to Ovalle's statements to police, Ovalle first met Nicholson at that time when the person Nicholson was looking for "wasn't home." Ovalle told the police that, in addition to wanting to buy marijuana, Nicholson was also looking for "the H" or "boyd"—other terms for heroin—or "anything, everything" because Nicholson "was sick and stuff like that." Ovalle said that Nicholson was about Ovalle's "son's age" and was "like his son," so Ovalle told Nicholson that "he was too young" and needed to "stop that" because he would end up "in bad shape." Nevertheless, Ovalle gave Nicholson "a little" of what Ovalle represented was heroin, in addition to some "weed." When Nicholson returned to his co-worker's car, one of his co-workers observed that he had "a clear baggie with a white powder in it."

According to Ovalle, a "few days" or "a week" later, Nicholson "came to see [him]" again because "he was real sick," and Ovalle "gave him a little bit" of "the boyd"—maybe "half of a gram or so"—without requiring Nicholson to pay for it. Ovalle said he did not want to "do anything to that boy—he's too young," but he "knows how it is when you're sick." Ovalle told police that Nicholson later complained that the drugs had given "him a headache," that they were "fake," and that they "w[ere]n't any good."

Ovalle's statements were substantiated by text messages between Nicholson and Ovalle. Nicholson did not have his own cell phone and used the cell phone of one of his co-workers to communicate with Ovalle. On June 19, 2021, Nicholson texted Ovalle

15

and said the "boyd," or heroin, he had gotten from Ovalle the night before was "bad." Specifically, the text message from Nicholson stated: "[T]his is the dude from last night[.] I did all of that boyd and felt nothing but a huge headache … I had to go to the hospital and get a shot because that's how bad I felt." Ovalle did not respond to Nicholson's text messages, and several hours later, Nicholson texted Ovalle again, saying "answer me," indicating that he knew where Ovalle lived. The next day, Ovalle texted the cell phone Nicholson had been using, saying "never threaten somebody by saying you know where they live it'll get you killed legally," and "don't know why [you] got headache."

Three days later, on June 23, Nicholson texted Ovalle that he thought Ovalle had "blocked" him, and Ovalle responded that he had not, but would "rather [Nicholson] called," stating that he did not "play games." That afternoon, Ovalle texted Nicholson again, stating "Call if you want." Nicholson then texted Ovalle, "Yea so we good," and Ovalle responded, "Might want to call," followed by "Or I can call." After Ovalle sent Nicholson several more text messages on June 24 saying, "Hey" or "Hello," Nicholson texted, "Yo you reup." Ovalle responded, "What you wanting," followed by "Hello." Nicholson asked, "Can I call you later?" and Ovalle responded, "It's you want better call broq." The following day, June 24, Ovalle and Nicholson apparently spoke on the phone because Ovalle's next text messages stated, "I'm on the way," followed by "Here but got to weigh."

Between 5:00 and 5:30 p.m. on the evening of June 24, while Nicholson was on his 30-minute break from his restaurant job, the following occurred: (1) Nicholson met Ovalle in the parking lot of the restaurant where Nicholson worked; (2) Nicholson got a gas can from Ovalle's car, took it to the gas station next door, filled the gas can with gas, returned to the restaurant parking lot,

16

and put some gas into Ovalle's car; (3) Nicholson approached the driver's side window, reached toward the window, then slipped something into his back pocket, and finished filling Ovalle's gas tank; (4) moments later, Ovalle drove out of the parking lot and away from the restaurant; (5) Nicholson walked over to his co-worker's truck in the parking lot, and minutes later, Nicholson walked back towards the restaurant, wiping his nose, and returned from his break; and (6) Nicholson immediately showed signs of impairment, including "acting funny," "eyes rolling into the back of his head," "sweating profusely," and "slurring his words." Shortly thereafter, Nicholson's stepfather was called to come pick up Nicholson, and Nicholson went home where, hours later, he died in his bedroom from "[f]entanyl toxicity." When Nicholson's blood was later tested by a forensic toxicologist, she testified that it contained 16 micrograms per liter of fentanyl, but no heroin.

On June 27, Ovalle—unaware that Nicholson had died—texted the cell phone Nicholson had been using again, saying "Hey bud," "Hello hello there," "Hey," and "Got some news." At first, Nicholson's co-worker, who owned the cell phone Nicholson had been using, started texting with Ovalle, but later, police officers took over the communications and ultimately set up another sale with Ovalle on July 3, 2021 of what Ovalle described in his messages as "[g]ood brown" that "[e]verybody is loving" and was "better than the other lol." On July 3, Ovalle was arrested while he was on the way to sell drugs to Nicholson, and a subsequent search of Ovalle's vehicle revealed that he had multiple, small plastic bags containing a powder that appeared to be heroin but was in fact fentanyl.

During his police interview, Ovalle initially told the officers that, after his second meeting with Nicholson to give him "the

boyd," he did not give Nicholson "nothing else" because Nicholson was "like [his] own son." And, while Ovalle admitted to seeing Nicholson on June 24 when Ovalle's car "ran out of gas" in the restaurant parking lot and Nicholson put gas in the car for him, Ovalle did not admit to selling Nicholson any drugs at that time. According to Ovalle, he told Nicholson he "was a good kid" and "wished he was [Ovalle's] son." However, Ovalle eventually conceded that, during that encounter, he sold Nicholson "not much, just a little bit … might have been a gram" of what Ovalle led Nicholson to believe was heroin for $150. Ovalle also admitted that the "dope that [he] sold [Nicholson] the second go round was" not "any different from the first."

Based on this evidence, the jury found Ovalle guilty of felony murder predicated on the distribution of a controlled substance, namely fentanyl, and the unlawful distribution of fentanyl.

Under OCGA § 16-5-1(c), "[a] person commits felony murder when, in the commission of a felony, he or she causes the death of another human being irrespective of malice." Our Court has interpreted this statute as setting forth three "related prerequisites the State must establish to convict a defendant of felony murder," *Eubanks v. State*, 317 Ga. 563, 568 (2023), which we have identified as follows: "[f]irst, the predicate felony the defendant committed must be one from which it was reasonably foreseeable that death could result"; "[s]econd, the death must have been the probable or natural consequence of the defendant's conduct, a concept known as 'proximate cause'"; and "[t]hird, … the death must have been caused 'in the commission of' the predicate felony." Id.

In large part, our Court has not considered these elements in isolation, but has long understood them to be related concepts.

18

See *Eubanks*, 317 Ga. at 571 (noting that the "in the commission of" element of felony murder "is closely related to proximate cause in that it concerns the connection between the felony and the death"); *Hood*, 303 Ga. at 422 ("This Court has repeatedly explained that the victim's death need not occur at the moment the predicate felony is committed, so long as the felony is the proximate cause of the death."); *State v. Jackson*, 287 Ga. 646, 649 (2010) (holding that "the phrase 'he [or she] causes' in OCGA § 16-5-1(c) establishes proximate causation as the standard for liability in felony murder cases") (cleaned up); *Hulme v. State*, 273 Ga. 676, 678 (2001) (noting that, in determining whether a felony meets the definition of being "inherently dangerous," "this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed," and then, the Court considers whether the defendant "directly cause[d] the death of the victim"); *State v. Cross*, 260 Ga. 845, 847 (1991) ("There is no merit to the defendant's contention that the victim must die during the commission of the underlying felony under a felony-murder indictment."); *Jones v. State*, 220 Ga. 899, 902 (1965) ("A murder may be committed in perpetration of a felony, although it does not take place until after the felony itself has been technically completed, if the homicide is committed within the res gestae of the felony." (cleaned up)). And, after considering these related elements in this case, I have no problem concluding that the evidence was constitutionally sufficient to satisfy *all* of them, and thus, the trial court erred in granting Ovalle's motion for new trial.

The first element—that the felony "must be dangerous per se or it must by its circumstances create a foreseeable risk of death," *Hulme*, 273 Ga. at 678 (cleaned up)—is not challenged here, but unquestionably has been satisfied. Distributing a lethal

19

dose of fentanyl to someone, particularly when that person believes he is receiving a dose of heroin, is inherently dangerous under our case law. See id.

This is how the forensic toxicologist described fentanyl: (1) "[f]entanyl is very toxic[, s]o a small amount can cause significant problems"; (2) "[f]entanyl is about 50 times more potent than heroin. It's about 100 times more potent than morphine. And it – mostly, it's because it gets into the system quickly, and it goes to where it needs to, to start acting on the brain and the body"; (3) fentanyl is "dangerous;" (4) fentanyl "hits quickly and it acts quickly," and "[i]t's stronger than these others"; and (5) fentanyl "also has the respiratory depression that comes with it. And that's usually what's the fatal part."

This is how the medical examiner described fentanyl: (1) fentanyl is "a dangerous drug in any setting"; (2) fentanyl "can kill"; (3) "[f]entanyl, a very potent narcotic, opiate, is 50 times more potent than heroin or 100 times more potent than morphine, will act very rapidly once a consumption, you know, by mouth, by nose, intravenously"; (4) "[f]entanyl medically prescribed … does have specific medical functions," but "illicitly manufactured [f]entanyl" does "not have the medical purpose"; and (5) "in this particular case, with the history of probably using illicit manufactured [f]entanyl, a level of 16 micrograms per liter, … the [f]entanyl took over and led to the death of Mr. Nicholson."

Through this and other evidence, the State established that, by selling fentanyl to Nicholson, Ovalle engaged in an inherently dangerous felony that created "a foreseeable risk of death." *Hulme*, 273 Ga. at 678.

I likewise conclude that the evidence was constitutionally sufficient to satisfy the second, proximate-cause element of felony murder because "the death *actually happened* in a way that was

a reasonably foreseeable result of the criminal conduct—that is, the death" was "a probable or natural consequence of the criminal conduct." *Eubanks*, 317 Ga. at 569 (quotation marks omitted). See also *Sinkfield*, 318 Ga. at 537 (holding that "[p]roximate cause is satisfied for purposes of felony murder when the death was a reasonably foreseeable result of the criminal conduct at issue").

> Proximate causation exists in this context if the felony the defendant committed directly and materially contributed to the happening of a subsequent accruing immediate cause of the death, or if the homicide was committed within the res gestae of the felony and is one of the incidental, probable consequences of the execution of the design to commit the predicate felony. These proximate cause determinations are generally left to the jury at trial.

*Hood*, 303 Ga. at 422–23 (cleaned up).

The evidence in this case showed that, after giving Nicholson two prior doses of fentanyl—one of which Ovalle knew caused Nicholson to go to the hospital—Ovalle sold Nicholson a final and lethal dose of the drug. Nicholson took the fentanyl; it immediately sickened him; and it killed him several hours later. There is no doubt in the record about that. And, even if the trial court improperly focused on Nicholson's act of taking the fentanyl, as opposed to Ovalle's act of selling it to him, we have said that a defendant would still be guilty of felony murder if "the intervening act" could "reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer." *Calhoun v. State*, 308 Ga. 146, 149 (2020) (cleaned up). Stated another way, the proximate-cause element is satisfied for purposes of felony murder when the intervening act causing the death is "reasonably foreseeable." *Eubanks*, 317 Ga. at 569–70. And, "[g]enerally, an intervening act is

reasonably foreseeable if, among other things, it may ensue in the ordinary course of events, or if it was set in motion by the original wrongdoer." Id. (citing *Jackson*, 287 Ga. at 651) (cleaned up).

As such, even if Nicholson's act of ingesting the lethal dose of fentanyl could be considered an "intervening act," as was argued by Ovalle in his motion for new trial, it was certainly foreseeable under the circumstances since this act was "anticipated" and "foreseen" by Ovalle, a drug user himself, who had provided this fentanyl to Nicholson before. *Calhoun*, 308 Ga. at 149. And, certainly, Nicholson's act of ingesting the lethal dose of fentanyl was "set in motion" by Ovalle's distribution of that drug, as the drug would not have been ingested otherwise. *Eubanks*, 317 Ga. at 570. Therefore, Nicholson's death was "closely related temporally and spatially" to Ovalle's distribution of fentanyl; "it occurred during the res gestae of that felony; and it was a reasonably foreseeable consequence of that inherently dangerous felony." *Hood*, 303 Ga. at 423–24.

Turning to the third, in-the-commission-of element of felony murder, this Court has consistently held that this element of felony murder requires only that "the predicate felony must be at least concurrent with the homicide in part, and be a part of it in an actual or material sense." *Sinkfield*, 318 Ga. at 537 (quotation marks omitted). See also *Eubanks*, 317 Ga. at 572 ("We have said that a death is caused in the commission of a predicate felony if the cause of death is within the res gestae of the predicate felony. In plain English, this means that the predicate felony must be at least concurrent with the homicide in part, and be a part of it in an actual or material sense." (citing *Lee v. State*, 270 Ga. 798, 801 (1999) and *Davis v. State*, 290 Ga. 757, 761 (2012) (cleaned up)). "[T]he in-the-commission-of requirement" simply asks "whether the cause of death was close enough in time and circumstances to

the felony," *Eubanks*, 317 Ga. at 572 (citing *Smith v. State*, 307 Ga. 106, 113 (2019)), and the State only has to prove "that the cause of death was sufficiently connected in time, place, and circumstance" with the predicate felony, *Eubanks*, 317 Ga. at 577–78 (citing *Hood*, 303 Ga. at 423–24 and *Cooper v. State*, 286 Ga. 66, 67 (2009)). "There is no requirement that the victim must die during the commission of the underlying felony under a felony-murder indictment." *Cooper*, 286 Ga. at 67. And, "like proximate cause, the 'in the commission of' inquiry is fact-specific." *Eubanks*, 317 Ga. at 573.

Here, Nicholson's ingestion of a fatal dose of fentanyl provided to him minutes earlier by Ovalle "was sufficiently connected in time, place, and circumstance" to Ovalle's distribution of that fentanyl to Nicholson, *Eubanks*, 317 Ga. at 578, rendering Ovalle's felonious conduct "at least concurrent with" Nicholson's death "in part, and … a part of it in an actual or material sense," *Sinkfield*, 318 Ga. at 537.

The evidence shows that, within minutes of Nicholson's purchase of the "little bit" of fentanyl that Ovalle sold to him, representing it was heroin, Nicholson ingested the entire dose—a drug which, unbeknownst to Nicholson, was "50 times more potent than heroin." And the amount of fentanyl Nicholson received was always controlled by Ovalle. By his own admission, Ovalle gave Nicholson a set dosage of the drug when they first met, claiming it was heroin. Ovalle then gave Nicholson another free dosage of fentanyl when Nicholson "came to see him" a second time. And during their final encounter, Ovalle sold another set dosage of fentanyl to Nicholson. Each time, the fentanyl dose had been weighed and packaged by Ovalle. And, this final time, the dosage Ovalle "distributed" to Nicholson immediately sickened him upon ingestion and then killed him hours later. And it is clear

from the record that Ovalle would have distributed fentanyl to Nicholson again had Nicholson lived, as demonstrated by Ovalle's text messages to someone he thought to be Nicholson setting up another drug purchase, and Ovalle's possession of bags of fentanyl—but no heroin—at the time of his arrest on July 3.

This evidence demonstrates that Nicholson's fatal injury would not have occurred but for Ovalle's distribution of a deadly dose of fentanyl—satisfying the "in the commission of" element of OCGA § 16-5-1(c). See *Hood*, 303 Ga. at 422–24; *Chua v. State*, 289 Ga. 220, 229–30 (2011) (concluding that the defendant's felonies of "illegally providing" methadone to the victim through prescriptions "were dangerous felonies" and that the "methadone in [the victim's] blood alone was sufficient to kill him," authorizing the jury "to find the evidence established … that [the defendant's] act of prescribing methadone directly and materially contributed" to the victim's death and to find the defendant "guilty beyond a reasonable doubt of felony murder") (cleaned up); *Hulme*, 273 Ga. at 678–70 (concluding that, "because [the defendant] was so actively involved with controlling the victim's dosages," "because the evidence show[ed] that the victim routinely took the dosages that [the defendant] provided to her," "because the evidence show[ed] that the victim took the potentially lethal dosage from [the defendant] on the day of her death," and "because the potentially lethal dose of methadone contributed to the victim's death," the defendant's "actions directly caused the victim's death within the meaning of our felony murder statute").

In conclusion, the evidence presented at trial—when viewed in the light most favorable to the verdicts—was constitutionally sufficient for a rational jury to find that Ovalle's felonious act of distributing fentanyl to Nicholson (1) was inherently dangerous; (2) was the proximate cause of Nicholson's death, since it

24

was reasonably foreseeable that Nicholson would ingest the fatal dose of fentanyl after he purchased it—an act that was also "set in motion" by Ovalle—*Calhoun*, 287 Ga. at 651; and (3) was "sufficiently connected in time, place, and circumstance" to Nicholson's ingestion of the fatal dose of fentanyl, *Eubanks*, 317 Ga. at 578. Therefore, the evidence was legally sufficient for a rational jury to find Ovalle guilty beyond a reasonable doubt of felony murder, and I would reverse the trial court's granting of Ovalle's motion for new trial. Accordingly, I respectfully dissent to the majority's decision to vacate and remand this case for further consideration of Ovalle's motion for new trial.[6]

---

[6] Notably, the General Assembly recently enacted OCGA § 16-5-3.1, which provides that "[a] person commits the offense of aggravated involuntary manslaughter when he or she causes the fentanyl overdose death of another human being, without the intent to cause the death of said human being, by intentionally manufacturing or selling any substance that contains fentanyl, after representing that such substance was any controlled substance." OCGA § 16-5-3.1(b). However, this statute apparently does not apply to controlled substances other than fentanyl or to situations where the fentanyl was *given* or distributed *without compensation* to the other person, as opposed to being *sold* to the other person or distributed "with an agreement, express or implied, to be compensated with money at a later date." OCGA § 16-5-3.1(a)(4). Additionally, this statute does not address venue, which is an issue that can arise in these cases. See *Lewis v. State*, 322 Ga. 134 (2025). If the General Assembly is concerned about venue in these kinds of cases, they could consider modifying this statute to provide that venue is proper in any county where the sale of the controlled substance or a resulting death occurred. Importantly, this statute was not in effect at the time of Ovalle's crimes or convictions.

25